UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

| | | |
|---|---|---|
| JAMAL SAMAHA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | 20 CV 2610 |
| | ) | |
| The CITY OF CHICAGO, Illinois, a municipal Corporation, and Chicago Police Officer FLORES, | ) ) ) | Judge |
| | ) | Magistrate Judge |
| | ) | |
| Defendants. | ) | |

## COMPLAINT

Plaintiff, Jamal SAMAHA, by and through his attorneys, The Hamilton Law Office, LLC, makes the following complaint against Defendants CITY OF CHICAGO and Chicago Police Officer FLORES:

## JURISDICTION AND VENUE

1. This action is brought pursuant to 42 U.S.C. §1983 to redress the deprivation under color of law of Plaintiff's rights as secured by the United States Constitution.

2. This Court has jurisdiction over the action pursuant to 28 U.S.C. §§1331 and 1343.

3. Venue is proper under 28 U.S.C. §1391(b). All parties reside in this judicial district and the events giving rise to the claims asserted in this complaint occurred within this district.

## PARTIES

4. Plaintiff Jamal SAMAHA is a 27-year-old African-American male who works in medical sales, and lives in the City of Chicago.

5. At all relevant times, Defendant FLORES is or was a Chicago Police Officer employed by Defendant CITY and acting under the color of law and within the scope of his employment.

6. Defendant CITY is a municipal corporation duly incorporated under the laws of the State of Illinois, and was, at all relevant times, the employer and principal of Defendant FLORES.

Should Plaintiff prevail on his claims, Defendant CITY is liable to Plaintiff on his *Monell* claim and must indemnify Defendant FLORES on Plaintiff's federal claims pursuant to 725 ILCS 10/9-102.

### Defendant FLORES's Unlawful Stop of SAMAHA

7. On March 15, 2019, at approximately 12:17 p.m., SAMAHA was driving in the Gold Coast neighborhood at the intersection of Michigan Avenue and Oak Street.

8. On March 15, 2019 Defendant FLORES was on duty and working as a Chicago police officer in a marked Chicago police vehicle.

9. At approximately 12:17 p.m. on March 15, 2019, Defendant FLORES was also driving in the Gold Coast neighborhood, making a U-Turn from South Lake Shore Drive to North Lake Shore Drive.

10. At the time he encountered SAMAHA, Defendant FLORES did not have his emergency lights or sirens activated.

11. At the time he encountered SAMAHA, Defendant FLORES was not responding to any emergency.

12. After completing his U-turn, Defendant FLORES attempted to pass a car that was in front of him, but he could not because SAMAHA's vehicle was occupying the lane next to Defendant FLORES.

13. Defendant FLORES did not activate his turn signal indicating that he intended to change lanes until SAMAHA's vehicle was already passing Defendant FLORES's police car.

14. SAMAHA was not doing anything illegal and was obeying all traffic laws.

15. Nonetheless, Defendant FLORES initiated a traffic stop of SAMAHA.

16. Defendant FLORES did not have reasonable suspicion or probable cause to initiate a traffic stop of SAMAHA.

17. On information and belief, Defendant FLORES would not have pulled SAMAHA over if he were Caucasian.

18. During this traffic stop, Defendant FLORES falsely accused SAMAHA of speeding.

19. During this traffic stop, Defendant FLORES made it clear that he was angry because SAMAHA had not automatically yielded to FLORES's police car.

20. After approaching SAMAHA's vehicle, Defendant FLORES told SAMAHA that he (Defendant FLORES) was not SAMAHA's "homie from the corner" or words to that effect.

21. The term "homie" is a racial slur referring to young African-American males.

22. Defendant FLORES detained SAMAHA and his passengers on the side of North Lake Shore Drive while he verbally threatened SAMAHA.

23. SAMAHA was not free to leave during this interaction with Defendant FLORES.

24. At some point after he had already been yelling at SAMAHA, Defendant FLORES noticed that SAMAHA was recording the traffic stop.

25. Defendant FLORES's released SAMAHA without any tickets or citations.

### The City of Chicago's Long History of Unconstitutional Stop and Frisks

26. Defendant CITY has a long history of unlawful stop and frisks ("*Terry* stops"), including disproportionately high rates of stop and frisks of African Americans.

27. This history dates back as far as the 1980s when the Chicago police would conduct sweeps of supposed high-crime neighborhoods. In the early 1980s, the Chicago Reporter found that more than 100,000 citizens were arrested for "disorderly conduct" during sweeps of high-crime neighborhoods. These arrests were usually preceded by a stop and frisk and the cases almost never resulted in convictions because the police generally did not show up in court to defend the arrest. An American Civil Liberties Union ("ACLU") lawsuit successfully challenged this practice

3

and, as a result, disorderly conduct arrests and their accompanying stop and frisks plummeted. *Michael Nelson v. City of Chicago*, 83 CV 1168 (N.D. Ill.)

28. In the 1990s, organized *Terry* stops reemerged under the "gang loitering ordinance." That ordinance – later struck down by the U.S. Supreme Court – resulted in more than 40,000 arrests over 18 months of enforcement. *City of Chicago v. Morales*, 527 U.S. 41 (1999). Massive numbers of people were arrested and searched, often without a legally justifiable reason, for refusing to follow dispersal orders. In reality, the ordinance was a method for stopping and searching young men of color.

29. In the early 2000s, unwarranted stops and searches were still commonplace. In 2003, the ACLU filed a lawsuit on behalf of Olympic Gold medalist Shani Davis and several others, challenging a series of humiliating stop and frisk searched by Chicago police. *Davis v. City of Chicago*, 03 CV 2094.

30. Data collected in connection with that suit showed a pattern of unjustified stops and searches, resulting in the unnecessary detention of young people, mostly young people of color. The City ultimately settled the *Davis* lawsuit, and as a result made changes to the police department's policy of stopping and searching on the streets, including a requirement to record why stops occur.

31. The manner in which the City implemented the recordkeeping has proved insufficient and Defendant CITY's widespread policy and practice of unconstitutional *Terry* stops persists to this day.

32. In 2014, the ACLU conducted a review of Defendant CITY's data on its use of stop and frisk. The ACLU published its report in March 2015.

33. In its report, the ACLU concluded that there are persistent problems with how Defendant CITY uses stop and frisks, including inadequate training, supervision, and monitoring of law enforcement in minority communities.

34. The ACLU found that officers frequently stopped individuals for reasons unrelated to a suspicion of a crime and that both police officers and supervisors need additional training on when a stop is legally justified.

35. The report found that in half of CPD's stops (based on the sample analyzed), the officer did not record legally sufficient reasons to establish reasonable suspicion. The ACLU also found that a large percentage of Chicago police officers did not record the reasons for the stop, even though the department requires that officers do so. These stops made without sufficient cause violate the Fourth Amendment guarantee against reasonable searches and seizures.

36. The ACLU report also found that African Americans were disproportionately subjected to stops when compared to their white counterparts. African American Chicagoans were subjected to 182,048 stop and frisks, meaning they were the targets of 72% of all stops despite constituting just 32% of the City's population.

37. Furthermore, there were more stops per capita in minority neighborhoods. For example, in the minority district Englewood there were 266 stops per 1,000 people, while in the predominantly white district Lincoln/Foster there were 43.

38. The difference in stop rates among racial groups also occurs outside minority communities. In Jefferson Park, a predominantly white district, African Americans made up almost 15% of all stops even though the African American population is just 1% there.

39. The report also found that there were more than 250,000 stops that did not lead to an arrest in Chicago for the time period of May 1, 2014 through August 31, 2014. Comparing stops to

5

populations, Chicagoans were stopped at a far higher rate than New Yorkers at the height of New York City's stop and frisk practice in 2011.

40. From May to August 2014, there were 93.6 stops per 1,000 people in Chicago. By contrast, in 2011, at the height of New York City's stop and frisk practice, there were 22.9 stops per 1,000 people.

41. As a result of the ACLU's investigation, Defendant CITY entered into a settlement agreement with the ACLU where Defendant CITY agreed to take steps to ensure that CPD policies and practices comply with the Fourth Amendment and the Illinois Civil Rights Act.

42. Former Magistrate Judge Arlander Keys oversees Defendant CITY's compliance with the agreement and conducts independent evaluations of CPD's practices and procedures, data collection, and additional training for officers.

43. Pressure to conduct unwarranted stop and frisks come from the highest-ranking officials in the police department. At a 2013 meeting discussing crime control and strategy, former Chicago Police Superintendent Gary McCarthy told a deputy chief, "[e]verything will improve if we just get out of the cars and put our hands on people." McCarthy said, "[m]ake sure your officers are doing this, making out contact cards, and make sure we are stopping the right people at the right times and the right places."

44. The United States Department of Justice ("DOJ") undertook an investigation of the Chicago Police Department and released a report with its findings in January 2017.

45. The DOJ report found evidence of race-based policing including stop and frisks.

46. According to the DOJ report, "[o]ne *sergeant* told us that 'if you're Muslim, and 18 to 24, and wearing white, yeah, I'm going to stop you. It's not called profiling, it's called being proactive.'" (emphasis in original).

47. "CPD's own officers, especially, but not only, its black officers, acknowledge profiling and harassment by CPD. A lieutenant told us, 'I'm a black man in Chicago, of course I've had problems with the police.'"

48. "One black officer said that he had been stopped many times by police in the Englewood neighborhood for no reason other than he is a black man in a nice car."

49. Under current CPD policy, Chicago police officers are required to record and justify their stops on "Investigatory Stop Reports" ("ISR"). Supervisors are required to review the facts and circumstances of each individual stop, correct the officer, and if necessary, recommend training or discipline to officers who have failed to provide a legal justification for a stop.

50. The DOJ report found that "the new ISR forms were quickly rolled out without a thoughtful, comprehensive training plan that took into account officers' predictable concerns and the broader context. Instead of taking the opportunity to instruct officers about how to conduct lawful and safe stops and searches, the ISR training focused only on how to fill out the new form."

51. Furthermore, the DOJ report found that "[s]upervisors did not receive training before their subordinates did, and were therefore unprepared to provide guidance."

52. These systemic failures by the City of Chicago to properly screen, train and supervise CPD officers regarding stop and frisk; adequately monitor and discipline CPD officers regarding stop and frisk; and encouraging, sanctioning and failing to rectify CPD's custom and practice of suspicion-less stop and frisks have encouraged officers like Defendant FLORES in his belief that he could stop SAMAHA without a warrant, probable cause, reasonable suspicion, consent, or any other lawful basis.

**COUNT I**
(42 U.S.C. § 1983 – Unreasonable Seizure)

53. Each of the preceding paragraphs is incorporated as if fully restated here.

54. As described above, Defendant FLORES had no legal justification, no reasonable suspicion or probable cause and no consent to stop SAMAHA and thus, he did so in violation of the Fourth Amendment to the United States Constitution.

55. As a direct and proximate result of this unlawful seizure, SAMAHA suffered damages, which will be proven at trial.

**WHEREFORE**, SAMAHA prays for a judgment against Defendant FLORES in a fair and just amount sufficient to compensate him for his damages, plus punitive damages, as well as court costs, attorneys' fees, and such other relief as is just and equitable.

## COUNT II
(42 U.S.C. §1983 – Equal Protection Claim)

56. Each of the preceding paragraphs is incorporated as if fully restated here.

57. In the manner described above, Defendant FLORES intentionally discriminated against SAMAHA on the basis of his race in violation of the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution.

58. As a result of Defendant FLORES's misconduct described in this Count, SAMAHA suffered damages, which will be proven at trial.

**WHEREFORE,** SAMAHA prays for a judgment against Defendant FLORES in a fair and just amount sufficient to compensate him for his damages, plus punitive damages, as well as court costs, attorneys' fees, and such other relief as is just and equitable.

## COUNT III
(Policy Claim – Defendant CITY)

59. Each of the preceding paragraphs is incorporated as if fully restated here.

60. The misconduct of Defendant FLORES alleged above was undertaken pursuant to the policy and practice of Defendant CITY.

61. As a matter of both policy and practice, Defendant CITY has encouraged the type of police misconduct at issue in this case by failing to adequately train, investigate, and/or discipline Chicago police officers, and these failures constitute deliberate indifference.

62. The following of Defendant CITY's policies and persistent widespread customs and practices were the driving force behind Defendant FLORES's misconduct:

    A. Failing to adequately train, monitor, supervise, and discipline Chicago police officers in the exercise of their discretion to stop, detain, and search civilians.

    B. Failing to conduct adequate auditing to determine if the stop and frisks conducted by CPD officers comply with the Fourth Amendment.

    C. Failing to take sufficient corrective and remedial action against CPD officers who provide fabricated, false, or impermissible justifications for stop and frisks.

    D. Encouraging, sanctioning, and failing to rectify CPD's custom and practice of suspicionless stop and frisks.

    E. Stopping, detaining, and searching civilians without a warrant, probable cause, reasonable suspicion, consent, or any other lawful basis.

63. These policies, practices or customs of Defendant CITY, individually and collectively, have been maintained and/or implemented with deliberate indifference by Defendant CITY, encouraging and allowing Defendant FLORES to commit the wrongful acts against SAMAHA, and therefore acted as the direct and proximate cause of the injuries sustained by SAMAHA.

64. These policies, practices or customs of Defendant CITY, individually and/or collectively were the moving force behind Defendant FLORES's conduct, depriving SAMAHA of his rights under the United States Constitution.

**WHEREFORE**, SAMAHA prays for a judgment against Defendant CITY in a fair and just amount sufficient to compensate him for his damages, injunctive and declaratory relief, as well as such other relief as is just and equitable.

**PLAINTIFF DEMANDS TRIAL BY JURY.**

Respectfully submitted,

JAMAL SAMAHA, Plaintiff

By: /s Torreya L. Hamilton
    Attorney for Plaintiff

The HAMILTON LAW OFFICE, LLC
53 West Jackson Boulevard, Suite 452
Chicago, Illinois 60604
312.726.3173
tlh@thehamiltonlawoffice.com
Attorney No. 6229397